**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| ESTATE OF LATAURUS HARRISON,<br>By and through administrator,<br>RUBY HARRISON-FOARD,<br><br>Plaintiff,<br>v.<br><br>MASON BRIZENDINE, GRANT STEPHENS, CHRIS BURKHARDT, and UNKNOWN OFFICERS OF COUNTY OF MADISON and COUNTY OF MADISON,<br><br>Defendants. | ) | CAUSE NO.: 1:25-cv-01061-JPH-MKK |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO BAR THE OPINION OF JOHN J. RYAN**

Defendants, Mason Brizendine, Grant Stephens, Chris Burkhardt and County of Madison, by counsel, submit this Response in Opposition to Plaintiff's Motion in Limine to Bar the Opinion of John Ryan ("Ryan") as follows:

## I. INTRODUCTION

Plaintiff seeks to exclude Ryan's opinions concerning Harrison brandishing a handgun. Plaintiff's motion improperly characterizes Ryan's identification of the object depicted in the body worn camera footage as though Defendants were offering him as a forensic video analyst. Defendants offer Ryan as an experienced law enforcement and police practices expert. Among other evidence, including the Indiana State Police investigation file, Ryan reviewed the body worn camera footage and, when evaluating the totality of the circumstances, including identifying the object that Harrison was holding to be a handgun, Ryan formed his opinion that Brizendine's use of deadly force was consistent with generally accepted policing policies, practices, and training.

That opinion falls squarely within Ryan's expertise and would be helpful to a jury in understanding appropriate police training and practices, which is not within the common understanding of a lay person. Ryan has spent more than four decades in law enforcement, including twenty years serving as a police officer, detective, supervisor, training director, and police captain. Since retiring from active police service, he has trained and advised law enforcement agencies nationwide on use of force, officer safety, firearms, arrest procedures, and other high-risk police practices. His testimony will explain generally accepted police practices and training, including how officers assess threats, why officers focus on a subject's hands, how action-reaction principles affect the response to an apparent firearm, how body-camera perspectives may differ from an officer's perception, and how officers are trained to make decisions during tense and rapidly evolving encounters.

To the extent Plaintiff seeks to exclude all of Ryan's opinions beyond his opinion regarding the visibility of the handgun, she has failed to address how his remaining opinions, which include the totality of circumstances officers are trained to consider when deploying lethal force, are unreliable or irrelevant under Rule 702.

## II. BACKGROUND

Plaintiff's complaint arises from a police action shooting that occurred when defendants were attempting to serve a warrant and Lataurus Harrison refused multiple lawful commands while attempting to stonewall officers before Harrison pulled a handgun and pointed it in the direction of one of the deputies. As of October 1, 2026, Defendants' Motion for Summary Judgment was fully briefed and is pending before the Court. [Dkts. 59, 62]. The matter is not currently set for a trial.

On March 16, 2026, Defendants disclosed Ryan as an expert expected to testify at the

trial on the subject matter and opinions contained in his report. [Dkt. 47; Dkt. 60-17 – John Ryan's Expert Report]. On April 27, 2026, Plaintiff sent a non-party request to Ryan to obtain, among other things, all information he relied on to form his opinions. Then, on May 29, 2026, Plaintiff deposed Ryan. [Dkt. 60-18 – John Ryan's Deposition Transcript]. Plaintiff elected to depose Ryan before deposing the defendants and Indiana State Police detectives.

Plaintiff's Motion in Limine seeks to "bar the expert report and testimony of Jack Ryan at trial." [Dkt. 101 at p. 5]. However, the focus of Plaintiff's motion centers on whether Ryan has the expertise to determine that Harrison was holding a firearm in the pivotal moments when Brizendine used lethal force. Thus, it is unclear from Plaintiff's motion if she is trying to prevent Ryan from offering any opinions or merely an opinion as to whether Harrison threatened defendants with a firearm.

Strangely, Plaintiff's motion commences with a regurgitated synopsis of her summary judgment argument and then, even more bizarrely, highlights the fact that Defendants "did not reference Mr. Ryan's expert testimony in their statement of facts not in dispute" and "relied very little" on Ryan's opinions in support of summary judgment. [Dkt. 101 at p. 2]. Since Ryan offers opinions and not facts it stands to reason that Defendants did not rely on his opinions in their statement of material facts. While Defendants do not endorse the characterization of how extensively they relied on Ryan's opinions in support of their motion for summary judgment, it has no bearing on whether Ryan should be allowed to testify at trial.

Plaintiff asserts that Ryan "lacks the necessary expertise" to offer opinions concerning the shooting because he purportedly failed to use reliable or reasonable methodology, and his opinions are irrelevant or unhelpful to the jury. [Dkt. 101 at p. 2]. Plaintiff broadly characterizes Ryan's opinions as unreliable, premature, and irrelevant as he did not read the Defendants'

depositions or police reports.[1] [*Id.* at 2-3]. As stated further below, these arguments are a red herring as they go to the weight of his opinions not to admissibility. Moreover, Plaintiff mischaracterizes Brizendine's deposition testimony and the interplay between that testimony and Ryan's extensive experience and training in law enforcement, as well as the methodology he employed in evaluating the evidence. Ryan's opinions are grounded in his specialized knowledge and experience, are based on his review of the evidence, and will assist the jury in understanding generally accepted law enforcement practices and circumstances surrounding the use of force.

## III. LEGAL STANDARD

Federal Rule of Evidence 702 permits testimony by a witness who is qualified as an expert by knowledge, skill, experience, training, or education where (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." *Downing v. Abbott Lab'ys*, 48 F.4th 793, 808-809 (7th Cir. 2022) (quoting Fed. R. Evid. 702).

The trial judge must ensure that expert testimony evidence admitted "is not only relevant, but reliable." *Manpower, Inc., v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusion based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.* The district court is responsible for acting as a

---

[1] As noted above, Ryan's expert report was prepared before defendants were deposed. Moreover, Plaintiff elected to depose Ryan before defendants were deposed.

gatekeeper to ensure that all expert testimony satisfies the Rule's reliability and relevance requirements. *Stollings v. Ryobi Tech., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 589). But the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony. *Id.* A district court usurps the role of the jury if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed. *Manpower, Inc.*, 732 F.3d at 806. The proponent of the expert bears the burden of demonstrating that the admissibility requirements are met by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

## IV. ARGUMENT

### A. Defendants have shown by a preponderance of evidence that Ryan's opinions satisfy Rule 702 because they are grounded in his extensive law enforcement experience and training and are the product of a reliable methodology.

An expert may base an opinion on facts or data that the expert has been made aware of or personally observed. Fed. R. Evid. 703. Training and experience are proper foundations for expert testimony. *United States v. Parkhurst*, 865 F.3d 509, 516 (7th Cir. 2017); *see also Artis v. Santos*, 95 F.4th 518, 526 (7th Cir. 2024) ("But by now it is no secret that an expert need not wear a lab coat nor cite peer-reviewed studies to reliably lend his expertise to the trier of fact—experience is an equally valuable teacher."). In assessing reliability, the district court is free to fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission before it. *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002). As noted in *Conn*, the court of appeals have permitted trial courts to rely on established law enforcement methodologies to fulfill the mandate of Rule 702. *Id.*

Ryan's opinions are grounded in substantial law enforcement training. He has worked in law enforcement and police practices since 1981. [Dkt. 60-17 at 1, ¶1]. He served for twenty

years with the Providence Police Department, including as a patrol officer, detective, sergeant, lieutenant, Director of Training, policy author, and police captain. [Dkt. 60-17 at 2, ¶7]. Since retiring from active police service in 2002, Ryan has taught courses throughout the United States including police policy, arrest, search and seizure, use of force, police pursuits, civil liability for law enforcement agencies, and other high-risk law enforcement activities. [Dkt. 60-17 at 3, ¶8]. In 2021, Ryan developed a certification program for use of force instructors and investigators that has certified nearly one thousand officers and has received approval from multiple state law enforcement training authorities. [Dkt. 60-17 at 4, ¶11]. He also regularly researches and drafts law enforcement policies, produces training materials, and audits police agencies' policies and operations relating to high-risk critical law enforcement tasks, including use of force. [Dkt. 60-17 at 4, ¶13]. Ryan's background qualifies him to explain generally accepted police training and practices and to assess whether conduct shown by the evidence was consistent with those practices.

Plaintiff contends that Ryan failed to use any reliable or reasonable methodology and gave only an "I know it when I see it" opinion. [Dkt. 101 at 5]. That characterization misrepresents both Ryan's methodology and the process he used in this case. Ryan's methodology involves reviewing the documents, reports, statements, testimony, audio, and video provided to him, understanding the relevant facts without making credibility determinations, identifying any clear contradiction between video evidence and witness accounts, and applying his law enforcement experience, training, research, auditing, policy work, and knowledge of generally accepted police practices to those facts. [Dkt. 60-17 at 5-6, ¶18]. In this case, Ryan reviewed the 321-page Indiana State Police investigative file,

which included officer narratives and recorded interviews[2], five body-worn-camera recordings of officers on the scene at the time of the shooting. [Dkt. 60-18 at 12:9-18]. As set forth in footnote 2, Ryan also reviewed deposition testimony of the involved officers and State Police investigators. As part of his video review, he watched Defendants' body worn camera videos numerous times. [Dkt. 60-18 at 15:3-8, 16:17-25]. Ryan utilized the video software, Camtasia Snagit, which permitted frame by frame playback, zooming, and capture of still frames. [Dkt. 60-18 at 10:17-22]. He was already familiar with this software as he has previously used it in audits, training, and other case review. [*Id.*]. Rather than relying on a generalized observation, he reviewed the footage, focused on the frame in which the object was most clearly visible, and assessed the object's appearance and position in Harrison's hand. [Dkt. 60-18 at 70:13-25].

Finally, Plaintiff asserts that Ryan's observation that Harrison had a gun in hand at 8:57:45 "parrots" the prosecutor. [Dkt. 101 at pp. 3-4]. That assertion disregards Ryan's independent review and analysis of the video evidence. Ryan personally examined the footage and explained how he used frame by frame imaging to get the clearest view from Deputy Brizendine's body worn camera footage of Harrison brandishing a firearm when Brizendine used lethal force to confront the armed felon. [Dkt. 60-18 at 70:13-22].

Ryan also explained his familiarity and experience with Axon body worn cameras. He explained that Axon cameras capture footage at 30 frames per second. Based on this knowledge and use of image framing, Ryan explained that there would be additional frames prior to his still shot below that would capture the handgun as no human would be able to move a handgun into

[2] Ryan prepared his report based, in part, on State Police summaries of the deputies' recorded interviews, and reviewed the interview recordings before executing his declaration on July 31, 2026. [Dkt. 70 at 3, ¶9]. Ryan also reviewed the depositions of Defendants and State Police detectives before signing his declaration.

that position that quickly. [Dkt. 60-18 at 72:5-16, 22-25].







[Dkt. 60-17 at 23, ¶33].

Ryan's identification was not simply an unsupported assertion or repetition of another person's conclusion. It was based on his own examination of the footage, his familiarity with the technology used to review it, and his experience and training in law enforcement. Thus, Defendants have met their burden of proving that Ryan's anticipated testimony is reliable.

**B. Defendants have shown by a preponderance of evidence that Jack Ryan's report is relevant under Rule 702.**

Expert testimony must be helpful to the jury to be admissible. *Parkhurst*, 865 F. 3d at 516. "In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful." *Jimenez v. City of Chicago*, 732

F.3d 710, 721 (7th Cir. 2013). Indeed "when something peculiar about law enforcement (e.g., the tools they use or the circumstances they face) informs the issues to be decided by the finder of fact, a juror's everyday experience may not be enough to effectively assess reasonableness." *United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017).

Plaintiff argues that Ryan's opinion is "unhelpful to the jury" because it is either irrelevant or "squarely within the understanding of a lay person." [Dkt. 101 at p. 2]. This argument overlooks the specialized knowledge and training that law enforcement officers acquire in recognizing firearms and evaluating potential threats during rapidly evolving encounters. For example, Ryan provides admissible opinions concerning officer training when dealing with high-risk law enforcement encounters like those confronting these deputies. [Dkt. 60-17 at 24-36, ¶¶37-65]. After considering the totality of circumstances, at the most crucial moment, an experienced law enforcement officer is trained to recognize whether a person is holding a firearm during an encounter and to distinguish an armed presentation from ordinary hand movements or an unidentified object. [*Id.* at 31-32, 35-36, ¶¶58-59, 65-66]. While Ryan makes clear that he was able to identify the object Harrison was holding was a firearm, he also provides that "common law enforcement training makes clear that officers need not wait until they see the 'glint of steel' before using deadly force where there are objective facts supporting the belief that the subject is about to produce a gun or knife since an officer may be too late in responding and may suffer serious bodily harm or death. In training and certifying use of force instructors, investigators, and analysts throughout the United States, I point out that 'officers need not wait to act until they are staring down the barrel of a loaded gun. Simply reaching for a loaded gun is enough to create a substantial risk of serious bodily injury to another person.'" [*Id.* at 32, ¶59].

In *United States v. Felder*, 993 F.3d 57, 72–73 (2d Cir. 2021), the Second Circuit distinguished between an FBI agent's belated identification of an object in surveillance footage as a firearm and the testimony of a firearms expert who was permitted to make that identification. The FBI agent's testimony was excluded after he identified the object as a firearm for the first time during a break in his direct examination, despite having reviewed the footage numerous times before trial. *Id.* The district court questioned whether the agent's belated identification could properly be admitted as expert testimony and ultimately excluded the opinion because its probative value was diminished by its recent provenance and outweighed by the potential for prejudice. *Id.*

By contrast, the court permitted a firearms expert to identify the object as a firearm, including identifying its muzzle, slide, ejection port, and front portion. *Id.* at 72–73. Thus, *Felder* does not foreclose an expert's identification of a firearm in video footage. Instead, it illustrates the distinction between an identification offered by an agent who was not disclosed to provide that opinion and testimony offered by a qualified expert based on specialized firearms knowledge and experience. The expert's identification was admissible because recognizing and identifying the firearm in the footage involved knowledge and experience beyond that of the average juror. *Id.*

Similar to the firearms expert in *Felder*, Ryan's identification was based on his specialized knowledge and experience. He examined the body worn camera footage and explained that physical characteristics and positioning of the object led him to identify it as a handgun. Ryan specified that the body worn camera footage showed that Harrison's hand was on the gun in a position to shoot it as his hand was around the backstrap of the gun, and his finger appeared to be on the trigger guard. [Dkt. 60-18 at 86:15-87:9]. He also considered the

object's shadow in adjacent frames and the events immediately preceding the most pivotal image. These observations, considered in light of his law enforcement experience and specialized training, provide a basis for testimony that would assist the jury in evaluating the footage and understanding the circumstances confronting the officers.

Moreover, Ryan's testimony extends beyond identifying the handgun. Ryan concluded that Deputy Brizendine's use of deadly force was consistent with generally accepted policies, practices, training, and industry standards. [Dkt. 60-17 at 26, ¶ 45]. His analysis included the totality of circumstances and addressed the nature of the high risk encounter these officers faced when dealing with a felon who had escaped from home detention, lawful and consistent officer commands given, Harrison's movements and noncompliance, the importance of keeping a subject's hands visible, Harrison's stonewalling to buy time consistent with a "fight or flight" scenario, Harrison's escalation of risk during a rapidly evolving encounter with police before Harrison produced a firearm. These are not matters that can be evaluated through a juror's ordinary experience. [Dkt. 60-17; Dkt. 70 at 3, ¶10]. Ryan's opinions on police practices in high-risk encounters like the one at issue included perception reaction principles, and officers' training concerning immediate threats to themselves or others.

More specifically, Ryan considered Harrison's non-compliance after receiving multiple officer directives, and the continuous act of putting his hands up, then back down and reaching and eventually pulling out the handgun and pointing it in the direction of Stephens. [60-17 at 36-37, ¶66; Dkt. 60-18 at 69:1-10]. Ryan specified that Harrison's movements of reaching, bringing his hands down, and refusing to exit the vehicle were taken into consideration when analyzing whether the use of force was consistent with

generally accepted policies, practices, training, and industry standard. [Dkt. 60-18 at 69:1-10]. Ryan stated that this was consistent with somebody who is contemplating fight or flight, as he has experienced many times. [Dkt. 60-18 at 70:5-12]. Moreover, Ryan explained that once Harrison brandished the firearm, he could move it any direction at any time. [Dkt. 60-18 at 62:19-25].

Thus, Ryan's opinions will assist the jury in understanding not only what the body worn camera footage depicts, but also the significance of Harrison's actions from the perspective of an experienced law enforcement officer trained to recognize and respond to potential threats. Plaintiff's assertion that these matters fall within the ordinary understanding of a lay person disregards the specialized knowledge necessary to evaluate police practices, officer perceptions, and threat assessments during rapidly evolving encounters.

### C. Limiting Ryan's Testimony is Improper as Plaintiff's Motion Incorrectly Goes to the Weight of the Evidence and Not Admissibility.

As the Seventh Circuit explained in *Stollings, "*An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt. In *Daubert* the Supreme Court expressly envisioned this continued role for the jury when it reminded all that '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Stollings,* 725 F.3d at 766 (citing *Daubert*, 509 U.S. at 589).

Plaintiff contends that Ryan's opinion concerning when the handgun was observed conflicts with Brizendine's testimony. However, Ryan disclosed the factual basis for his opinion. He identified the frame he considered the clearest, explained the position of the object

in Harrison's hand, described the gun's appearance in adjacent frames, and connected his observations to his experience in law enforcement. Plaintiff may disagree with whether Ryan correctly perceived the image, whether the object could be identified reliably, and whether the circumstances support his threat assessment as those are proper subjects for cross-examination since they go to weight of the evidence not admissibility. Those disagreements, however, do not establish that Ryan's methodology is unreliable or that his testimony is inadmissible. Rather, they present issues that can be explored through cross-examination and competing evidence. The jury, not the Court acting as a factfinder, should determine what weight to afford Ryan's opinions.

**D. Plaintiff has failed to address how Ryan's other opinions are unreliable or irrelevant under Rule 702.**

It is unclear whether Plaintiff seeks to exclude Ryan's entire expert report and testimony or only his opinion concerning the visibility of the handgun. Although Plaintiff's substantive arguments in her Motion in Limine primarily focus on Ryan's identification of the handgun and the methodology he employed in reaching that conclusion, she requests the Court to "bar the expert report and testimony of Jack Ryan at trial." [Dkt. 101 at p. 5]. However, Plaintiff has not demonstrated that Ryan's remaining opinions fail to satisfy Rule 702.

While the Court should not limit Ryan's testimony concerning his identification of the handgun in the body worn camera footage, if it were to do so, that determination should not exclude Ryan's remaining opinions based on his extensive specialized background, education, training, and experience with law enforcement practices nationwide that Brizendine's use of deadly force was consistent with generally accepted policies, practices, training and industry standards. [Dkt. 70 at 2, ¶11]. Thus, even if Ryan were precluded from independently identifying the handgun in the footage, a jury would be aided in hearing his opinions considering

the the totality of the circumstances officers are trained to consider and react to when dealing with the rapidly evolving and high risk situation confronting these officers.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion in Limine seeking to bar Ryan's opinions should be denied.

Respectfully submitted,

**COOTS, HENKE & WHEELER, P.C.**

*/s/ Laura D. Parks*
Laura D. Parks, #36674-49
Matthew L. Hinkle, #19396-29
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on **November 25, 2026**, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and/or U.S. first-class mail:

Jon Loevy
Quinn K. Rallins
David B. Owens
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607

*/s/ Laura D. Parks*
Laura D. Parks, #36674-49

**COOTS, HENKE & WHEELER, P.C.**
255 East Carmel Drive
Carmel, IN 46032